UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD JACKSON, Individually and On Behalf of All Others Similarly Situated, | ) ) ) Case No. |
| Plaintiff, | ) ) ) COMPLAINT FOR VIOLATION OF ) THE FEDERAL SECURITIES LAWS |
| v. | ) ) ) DEMAND FOR JURY TRIAL |
| HALYARD HEALTH, INC., ROBERT E. ABERNATHY, STEVEN E. VOSKUIL, KIMBERLY-CLARK CORPORATION, THOMAS J. FALK, and MARK A. BUTHMAN, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Ronald Jackson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Halyard Health, Inc. ("Halyard" or the "Company"), Halyard's former parent company Kimberly-Clark Corporation ("Kimberly-Clark"), analysts' reports and advisories about Halyard and Kimberly-Clark, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who: (1) purchased or otherwise acquired Kimberly-Clark securities on or after February 25, 2013 (the "Kimberly-Clark Class Period") and subsequently received Halyard securities pursuant to Kimberly-Clark's spin-off of Halyard, effective as of October 31, 2014; and/or (2) purchased or otherwise acquired Halyard securities between October 21, 2014 and April 29, 2016, both dates inclusive (the "Halyard Class Period" and, together with the Kimberly-Clark Class Period, the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Halyard provides health and healthcare supplies and solutions worldwide. The Company operates through two segments, Surgical and Infection Prevention (S&IP), and Medical Devices.  Halyard markets its products directly to hospitals and other healthcare providers, as well as through third-party distribution channels.

3.      Prior to October 2014, Halyard was the Health Care operating segment of Kimberly-Clark, a manufacturer of personal care, consumer tissue, and professional products. Kimberly-Clark's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KMB."   On October 7, 2014, Kimberly-Clark announced the details for the completion of the spin-off of its Health Care segment as Halyard Health, Inc., advising its shareholders that they would receive one share of Halyard Health common stock for every eight shares of Kimberly-Clark common stock held as of the close of trading on October 23, 2014, the record date for the spin-off.  On or about October 21, 2014, Halyard stock began trading on the NYSE under the ticker symbol "HYH."

4.     In late 2013, an outbreak of the Ebola virus began in Guinea, subsequently spreading to Liberia, Sierra Leone, and other West African nations.  In August 2014, after meeting with health ministers from eleven countries, the World Health Organization ("WHO") designated the outbreak as a Public Health Emergency of International Concern, a rarely-used designation that invokes legal measures on disease prevention, surveillance, control, and response by 194 signatory countries.  On September 30, 2014, the United States Centers for Disease Control and Prevention ("CDC") declared the first case of Ebola virus in the United States.

5.     As awareness of the Ebola epidemic grew, demand surged for the personal protective equipment ("PPE")—*i.e.*, eye shields, face masks and disposable gowns—made by Kimberly-Clark's Health Care segment and subsequently by Halyard, including the Company's MICROCOOL surgical gowns.

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (ii) Kimberly-Clark and Halyard had knowingly provided defective MICROCOOL surgical gowns to U.S. workers during the Ebola crisis; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

7.     On May 1, 2016, *60 Minutes* reported that Kimberly-Clark and Halyard had knowingly provided defective surgical gowns to U.S. workers at the height of the Ebola crisis.  A Company insider claimed that Halyard's MICROCOOL surgical gowns were prone to leaks and did not consistently meet the industry safety standards for the treatment of Ebola, but that

Kimberly-Clark and Halyard had nonetheless "aggressively" marketed the MICROCOOL gowns to hospitals during the epidemic.

8.    On this news, Halyard stock fell $1.21, or 4.3%, to close at $26.95 on May 2, 2016.

9.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the securities of Halyard and Kimberly-Clark are traded on the NYSE, located within this District.

13.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.    Plaintiff, as set forth in the attached Certification, acquired Halyard securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Halyard is incorporated in Delaware, and the Company's principal executive offices are located at 5405 Windward Parkway, Alpharetta, Georgia 30004.

16.     Defendant Robert E. Abernathy ("Abernathy") has served at all relevant times as Halyard's Chief Executive Officer ("CEO").

17.     Defendant Steven E. Voskuil ("Voskuil") has served at all relevant times as Halyard's Chief Financial Officer ("CFO").

18.     Defendant Kimberly-Clark is incorporated in Delaware, and the Company's principal executive offices are located at P.O. Box 619100, Dallas, Texas 75261.

19.     Defendant Thomas J. Falk ("Falk") has served at all relevant times as Kimberly-Clark's Executive Chairman and CEO.

20.     Defendant Mark A. Buthman ("Buthman") served as Kimberly-Clark's CFO from 2003 to 2015.

21.     The Defendants described in ¶¶ 16-17 and 19-20 are sometimes hereinafter referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Halyard provides health and healthcare supplies and solutions worldwide. The Company operates through two segments, Surgical and Infection Prevention ("S&IP"), and Medical Devices.  Halyard markets its products directly to hospitals and other healthcare providers, as well as through third-party distribution channels.  Prior to October 2014, Halyard was the Health Care operating segment of Kimberly-Clark, a manufacturer of personal care, consumer tissue, and professional products.

5

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on February 25, 2013, the first trading day after February 22, 2013, the date on which Kimberly-Clark filed its Annual Report for the quarter and year ended December 31, 2012 on Form 10-K with the SEC (the "2012 10-K").  In the 2012 10-K, with respect to its Health Care operating Segment, Kimberly-Clark stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives.  This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health.  This business is a global leader in education to prevent healthcare-associated infections.

24.     For 2012, Kimberly-Clark reported net sales of $1.62 billion for its Health Care segment, compared to net sales of $1.61 billion for 2011, an increase of 1%.

25.     The 2012 10-K contained signed certifications by Defendants Falk and Buthman, stating that the 2012 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

26.     On April 19, 2013, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 8-K").  For quarter, Kimberly-Clark reported net sales of $397 million for its Health Care segment, compared to net sales of $405 million for the same period in the prior year, a decrease of 2%.

27.     On May 2, 2013, Kimberly-Clark filed a Quarterly Report on Form 10-Q for the quarter ended March 31, 2013 with the SEC (the "Q1 2013 10-Q").  The Q1 2013 10-Q reiterated the financial and operating results previously announced in the Q1 2013 8-K.  In the Q1 2013 10-Q, with respect to its Health Care segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives. This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health. This business is a global leader in education to prevent healthcare-associated infections.

28.     The Q1 2013 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Q1 2013 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

29.     On July 22, 2013, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC announcing its financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 8-K"). For the quarter, the Company reported net sales of $401 million for its Health Care segment, compared to net sales of $411 million for the same period in the prior year, a decrease of 2.4%.

30.     On August 2, 2013, Kimberly-Clark filed a Quarterly Report on Form 10-Q for the quarter ended June 30, 2013 with the SEC (the "Q2 2013 10-Q"). The Q2 2013 10-Q reiterated the financial and operating results previously announced in the Q2 2013 8-K. In the Q2 2013 10-Q, with respect to its Health Care segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives. This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health. This business is a global leader in education to prevent healthcare-associated infections.

31.     The Q2 2013 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Q2 2013 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

32.     On October 22, 2013, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 8-K").  For the quarter, Kimberly-Clark reported net sales of $403 million for its Health Care segment, compared to net sales of $396 million for the same period in the prior year, an increase of 1.8%.

33.     On November 1, 2013, Kimberly-Clark filed a Quarterly Report on Form 10-Q for the quarter ended September 30, 2013 with the SEC (the "Q3 2013 10-Q").  The Q3 2013 10-Q reiterated the financial and operating results previously announced in the Q3 2013 8-K.  In the Q3 2013 10-Q, with respect to its Health Care segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives.  This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health.  This business is a global leader in education to prevent healthcare-associated infections.

34.     The Q3 2013 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Q3 2013 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

35.     On November 14, 2013, Kimberly-Clark issued a press release entitled "Kimberly-Clark Pursuing Spin-Off Of Health Care Business."  The press release advised investors that Kimberly-Clark's "board of directors has authorized management to pursue a potential tax-free spin-off of the company's health care business" and that "[i]f the board approves a spin-off, a transaction would likely be completed by the end of the third quarter of 2014."

36.     On January 24, 2014, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter

and year ended December 31, 2013 (the "2013 8-K").  For 2013, Kimberly-Clark reported net sales of $1.618 billion for its Health Care segment, compared to net sales of $1.622 billion for 2012, a decrease of 0.2%.

37.     On February 22, 2014, Kimberly-Clark filed its Annual Report for the quarter and year ended December 31, 2013 on Form 10-K with the SEC (the "2013 10-K").  The 2013 10-K reiterated the financial and operating results previously announced in the 2013 8-K.  In the 2013 10-K, with respect to its Health Care operating Segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives.  This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health.  This business is a global leader in education to prevent healthcare-associated infections.

38.     The 2013 10-K contained signed certifications by Defendants Falk and Buthman, stating that the 2013 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

## The 2014 Ebola Crisis

39.     In March 2014, the WHO reported that Guinea's Ministry of Health had reported an outbreak of Ebola virus in four southeastern districts, and that suspected cases in the neighboring countries of Sierra Leone and Liberia were under investigation.

40.     On April 21, 2014, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 8-K").  For the quarter, the Company reported net sales of $397 million for its Health Care segment, compared to net sales of $397 million for the same period in the prior year.

41.     Later on April 21, 2014, Kimberly-Clark filed a Quarterly Report for the quarter ended March 31, 2014 on Form 10-Q with the SEC (the "Q1 2014 10-Q").  The Q1 2014 10-Q reiterated the financial and operating results previously announced in the Q1 2014 8-K.  In the Q1 2014 10-Q, with respect to its Health Care segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives.  This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health.  This business is a global leader in education to prevent healthcare-associated infections.

42.     The Q1 2014 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Q1 2014 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

43.     On July 22, 2014, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K").  For the quarter, Kimberly-Clark reported net sales of $397 million for its Health Care segment, compared to net sales of $401 million for the same period in the prior year, a decrease of 1%.

44.     Later on July 22, 2014, Kimberly-Clark filed a Quarterly Report for the quarter ended June 30, 2014 on Form 10-Q with the SEC (the "Q2 2014 10-Q").  The Q2 2014 10-Q reiterated the financial and operating results previously announced in the Q2 2014 8-K.  In the Q2 2014 10-Q, with respect to its Health Care segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives.  This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health.  This business is a global leader in education to prevent healthcare-associated infections.

45.     The Q2 2014 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Q2 2014 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

46.     On or around August 8, 2014, following an Emergency Committee meeting, the WHO designated the outbreak as a Public Health Emergency of International Concern, a rarely-used designation that invokes legal measures on disease prevention, surveillance, control, and response, by 194 signatory countries.

47.     On August 14, 2014, Kimberly-Clark published a Pandemic Preparedness Customer Letter (the "Customer Letter").  In the Customer Letter, Kimberly-Clark stated, in part:

> Kimberly-Clark joins the world in the hope for the cessation of the spread of the virus and the discovery of a cure. While the transmission of the virus in West Africa has captured the attention of the world and increased anxiety about its potential to spread into North America, we want you to rest assured that Kimberly-Clark has activated its Pandemic Preparedness Plan which provides protocols for tracking the cadence of orders and monitoring supply of our critical Personal Protection Equipment products (PPE) including facial protection, exam gloves and protective apparel.

48.     On September 30, 2014, the CDC declared the first case of Ebola virus in the United States.

49.     On October 7, 2014, Kimberly-Clark announced the details for the completion of the spin-off of its Health Care segment, advising investors that they would receive one share of Halyard common stock for every eight shares of Kimberly-Clark common stock held as of the close of trading on October 23, 2014, the record date for the spin-off.  On or about October 21, 2014, Halyard stock began trading on the NYSE under the ticker symbol "HYH."

50.     On October 21, 2014, Kimberly-Clark issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter

ended September 30, 2014 (the "Kimberly-Clark Q3 2014 8-K"). For the quarter, the Company reported net sales of $392 million, compared to net sales of $403 million for the same period in the prior year, a decrease of 2.7%.

51.     Later on October 21, 2014, Kimberly-Clark filed a Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 with the SEC (the "Kimberly-Clark Q3 2014 10-Q"). The Kimberly-Clark Q3 2014 10-Q reiterated the financial and operating results previously announced in the Kimberly-Clark Q3 2014 8-K. In the Kimberly-Clark Q3 2014 10-Q, with respect to its Health Care segment, Kimberly-Clark also stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives. This segment offers surgical and infection prevention products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health. This business is a global leader in education to prevent healthcare-associated infections.

52.     The Kimberly-Clark Q3 2014 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Kimberly-Clark Q3 2014 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

53.     On October 21, 2014, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Halyard Q3 2014 8-K"). For the quarter, Halyard reported net sales of $279.2 million for its Surgical and Infection Prevention segment, compared to net sales of $287.0 million for the same period in the prior year.

54.     On October 31, 2014, *Reuters* published an article entitled "Halyard Health poised to shine in debut on back of Ebola scare." The *Reuters* article stated, in part: "Since Ebola was first diagnosed in the United States, demand has surged for the eye shields, face masks and

12

disposable gowns made by Halyard Health Inc, which is set to make its market debut on Monday.
. . . The Ebola outbreak—and fear of its spread in developed countries—is certain to spur growth
in demand for Halyard's products in the near future."

55.     Upon information and belief, at all relevant times the Ebola Preparedness section
of Halyard's website stated that the Company "want[ed] to proactively provide you with guidance
on preparing for a pandemic as well as solutions for proper PPE," and included a link to the
Halyard Personal Protection Solutions Guide (the "Personal Protection Guide"), a list of Halyard's
PPE products.  The Personal Protection Guide recommended Halyard's MICROCOOL Surgical
Gowns as a solution that offered "AAMI Level 4 / Liquid Barrier Protection."  By the AAMI Level
4 designation, Halyard represented that its MICROCOOL Surgical Gowns provided adequate
protection for situations that entailed a high exposure risk in terms of "fluid amount," "fluid spray
or splash" and "pressure on gown" per the guidelines established by the Association for the
Advancement of Medical Instrumentation.

56.     On November 11, 2014, Halyard filed a Quarterly Report on Form 10-Q with the
SEC for the quarter ended September 30, 2014 (the "Halyard Q3 2014 10-Q").  The Halyard Q3
2014 10-Q reiterated the financial and operating results previously announced in the Halyard Q3
2014 8-K.  In the Halyard Q3 2014 10-Q, the Company also stated, in part:

> Our products and solutions are designed to address some of today's most important
> healthcare needs, namely ***preventing infections*** and reducing the use of narcotics
> while helping patients move from surgery to recovery.  ***We market and support the
> efficacy, safety, and economic benefit of our products with a significant body of
> clinical evidence.***

(Emphases added.)

57.     The Halyard Q3 2014 10-Q contained signed certifications by Defendants
Abernathy and Voskuil, stating that the Halyard Q3 2014 10-Q "does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

58.     On March 4, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2014 (the "2014 8-K").  In the 2014 8-K, Halyard reported net sales of $1.14 billion for its Surgical and Infection Prevention segment, compared to net sales of $1.15 billion for 2013, a decrease of 2%.

59.     On March 13, 2015, Halyard filed its Annual Report for the quarter and year ended December 31, 2014 on Form 10-K with the SEC (the "2014 10-K").  The 2014 10-K reiterated the financial and operating results previously announced in the 2014 8-K.  In the 2014 10-K, Halyard also stated, in part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence***.
>
> . . .
>
> In our S&IP business, we are focused on maintaining our market position by providing innovative customer-preferred product enhancements, with a particular focus on the operating room. Leveraging customer insights and our vertically integrated manufacturing capabilities, we seek to continuously improve our product designs, specifications and features to deliver cost efficiencies while improving healthcare worker and patient protection.

(Emphases added.)

60.     The 2014 10-K contained signed certifications by Defendants Abernathy and Voskuil, stating that the 2014 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

61.     On May 4, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 8-K").  For the quarter, Halyard reported net sales of $254.8 million for its Surgical and Infection Prevention segment, compared to net sales of $275.5 million for the same period in the prior year, a decrease of 7.5%.

62.     On May 5, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  The Q1 2015 10-Q reiterated the financial and operating results previously announced in the Q1 2015 8-K.  In the Q1 2015 10-Q, the Company also stated, in part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely **preventing infections** and reducing the use of narcotics while helping patients move from surgery to recovery.  ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphases added.)

63.     The Q1 2015 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Q1 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

64.     On August 4, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K").  For the quarter, Halyard reported net sales of $255.3 million for its Surgical and Infection Prevention segment, compared to net sales of $285.5 million for the same period in the prior year, a decrease of 10.6%.

65.     On August 12, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  The Q2 2015 10-Q reiterated the

financial and operating results previously announced in the Q2 2015 8-K.  In the Q2 2015 10-Q, the Company also stated, in part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery.  ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphases added.)

66.     The Q2 2015 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Q2 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

67.     On November 3, 2015, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K").  For the quarter, Halyard reported net sales of $257.4 million for its Surgical and Infection Prevention segment, compared to net sales of $279.2 million for the same period in the prior year, a decrease of 7.8%.

68.     On November 4, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  The Q3 2015 10-Q reiterated the financial and operating results previously announced in the Q3 2015 8-K.  In the Q3 2015 10-Q, the Company also stated, in part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery.  ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphases added.)

16

69.     The Q3 2015 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Q3 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

70.     On February 29, 2016, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2015 (the "2015 8-K"). For 2015, Halyard reported net sales of $1.03 billion for its Surgical and Infection Prevention segment, compared to net sales of $1.14 billion for 2014, a decrease of 9.6%.

71.     Later on February 29, 2016, Halyard filed its Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K reiterated the financial and operating results previously announced in the 2015 8-K. In the 2015 10-K, Halyard also stated, in part:

> Our products and solutions are designed to address some of today's most important healthcare needs; namely, ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. . . . ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***
>
> . . .
>
> In our S&IP business, we are focused on maintaining our market position by providing innovative customer-preferred product enhancements, with a particular focus on the operating room. Leveraging customer insights and our vertically integrated manufacturing capabilities, we seek to continuously improve our product designs, specifications and features to deliver cost efficiencies while improving healthcare worker and patient protection. We continuously refresh our surgical drape and gown portfolio to ensure that our products are aligned with the latest procedural and market trends. Our research team works with healthcare providers to develop and design exam glove and apparel portfolios that optimize comfort and fit and provide cost-effective infection prevention solutions for use throughout the hospital.

(Emphases added.)

72.     In addition, Halyard reported a legal proceeding—not specifically disclosed in previous SEC filings—and receipt of a subpoena concerning the marketing and sale of the Company's MICROCOOL surgical gowns.  Halyard stated, in relevant part:

> We have an Indemnification Obligation for, and have assumed the defense of, the matter styled *Shahinian, et al. v. Kimberly-Clark Corporation, et al.,* No. 2:14-cv-08390-DMG-SH (C.D. Cal.), filed on October 29, 2014. In that case, the plaintiff brings a putative nationwide class action asserting claims for common law fraud (affirmative misrepresentation and fraudulent concealment), negligent misrepresentation, and violation of California's Unfair Competition Law in connection with our marketing and sale of MicroCool surgical gowns. On February 6, 2015, we moved to dismiss the complaint on multiple grounds. On July 10, 2015, the Court issued an order on the motion to dismiss, dismissing the negligent misrepresentation claim but permitting the remaining claims to stand and proceed to discovery. On December 11, 2015, the plaintiff filed a second amended complaint that added additional plaintiffs in California, Texas and Rhode Island, named Halyard Health, Inc. as an additional defendant, and extend the timeframe for the lawsuit to include products sold after the Spin-off through December 2015. The parties are currently engaged in discovery. We intend to continue our vigorous defense of the matter.
>
> In June 2015, we were served with a subpoena from the Department of Veterans Affairs Office of the Inspector General ("VA OIG") seeking information related to the design, manufacture, testing, sale and promotion of MicroCool and other Company surgical gowns, and, in July 2015, also became aware that the subpoena and an earlier VA OIG subpoena served on Kimberly-Clark requesting information about gown sales to the federal government are related to a United States Department of Justice ("DOJ") investigation. We could be subject to litigation relating to this investigation, by either governmental agencies or private parties. If a claim is asserted against Kimberly-Clark relating to MicroCool gowns or other Company surgical gowns, we expect that such a claim would give rise to an Indemnification Obligation under the distribution agreement with Kimberly-Clark. The Company is cooperating with the VA OIG's request and the DOJ investigation.

73.     The 2015 10-K contained signed certifications by Defendants Abernathy and Voskuil, stating that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

74.     The statements referenced in ¶¶ 23, 25, 27-28, 30-31, 33-34, 37-38, 41-42, 44-45, 51-52, 55-57, 59-60, 62-63, 65-66, 68-69, 71 and 73 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's MICROCOOL surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (ii) Kimberly-Clark and Halyard had knowingly provided defective MICROCOOL surgical gowns to U.S. workers during the Ebola crisis; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

### The Truth Emerges

75.     On May 1, 2016, *60 Minutes* reported that Kimberly-Clark and Halyard had knowingly provided defective surgical gowns to U.S. workers at the height of the Ebola crisis.  In an interview with Anderson Cooper, Bernard Vezeau, the global strategic marketing director for MICROCOOL and other products from 2012 to early 2015 (first at Kimberly-Clark, later at Halyard), stated that "the company went into high gear to sell the product" despite knowing that "the gowns were not consistently meeting industry standards."

Anderson Cooper: ***These gowns were being recommended for use with Ebola.***

Bernard Vezeau: Aggressively being recommended.

Anderson Cooper: In what way aggressively?

Bernard Vezeau: ***We put a full court press to drive MICROCOOL sales***. We told hospitals to stock up on our MICROCOOL products. We told 'em to have at least 8 to 12 weeks of product on hand. And that's when things became very difficult for me.

. . .

Bernard Vezeau: There is a test. And it's conducted in outside facilities.

Anderson Cooper: So ***did your gowns consistently pass this test?***

Bernard Vezeau: ***No, they did not.***

. . .

Anderson Cooper: Did you receive complaints from nurses, from surgeons at all?

Bernard Vezeau: On these gowns?

Anderson Cooper: Yeah.

Bernard Vezeau: Oh, frequently. On a very frequent basis.

Anderson Cooper: What kinda complaints?

Bernard Vezeau: Oh, ***complaints of strike-through, sleeves falling off, ties falling off.***

Anderson Cooper: Sleeves falling off.

Bernard Vezeau: Sleeves falling off. Sleeves falling off during a procedure.

Anderson Cooper: Were you at meetings where these problems were discussed?

Bernard Vezeau: Every time. ***We were the ones who were telling senior management the problems that we were having.***

(Emphases added.)

76.     The *60 Minutes* report also described an independent test in December 2012, requested by Cardinal Health, Inc., a competitor of Kimberly-Clark and later of Halyard, in which 77% of the MICROCOOL gowns tested failed.  The report also described February and March 2013 tests and laboratory reports, requested by Kimberly-Clark, in which some 21% of the MICROCOOL gowns tested failed, and in which some samples submitted "weren't even tested because the sleeves were so bad.  The lab took [the sleeves] out of the package and they were so bad that they didn't even test [them] because it was obvious what was going to happen."

77.     The *60 Minutes* report also referenced an internal Halyard PowerPoint presentation from November 2014 "that identifies a year-and-a-half 'gap in sleeve seams passing' the industry test," which Halyard's Chief Operating Officer, Chris Lowery, acknowledged having seen. Halyard advised *60 Minutes* that "[b]y January 2015 . . . [the Company] had new sealing machines in place to improve the quality of its sleeves," an acknowledgment that the manufacturing processes for the Company's MICROCOOL gowns had previously been inadequate.

78.     As a result of this news, Halyard stock fell $1.21, or 4.3%, to close at $26.95 on May 2, 2016.

79.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who (1) purchased or otherwise acquired Kimberly-Clark securities on or after February 25, 2013 and subsequently received Halyard securities pursuant to Kimberly-Clark's spin-off of Halyard, effective as of October 31, 2014, and/or (2) purchased or otherwise acquired Halyard securities between October 21, 2015 and April 29, 2016; and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

81.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Kimberly-Clark and subsequently Halyard securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Halyard, Kimberly-Clark or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Kimberly-Clark and/or Halyard;

- whether the Individual Defendants caused Kimberly-Clark and/or Halyard to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Kimberly-Clark and/or Halyard securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

85.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

86.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Kimberly-Clark and Halyard securities are traded in an efficient market;

- Kimberly-Clark's and Halyard's shares were liquid and traded with moderate to heavy volume during the Class Period;

- Kimberly-Clark and Halyard traded on the NYSE and were covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Kimberly-Clark's and Halyard's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Kimberly-Clark and/or Halyard securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

87.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

88.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

91.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kimberly-Clark and subsequently Halyard securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Kimberly-Clark and subsequently Halyard securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

24

92.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Kimberly-Clark and/or Halyard securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Kimberly-Clark's and/or Halyard's finances and business prospects.

93.     By virtue of their positions at Kimberly-Clark and Halyard, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

94.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Kimberly-Clark and/or Halyard, the Individual Defendants had knowledge of the details of the companies' internal affairs.

95.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of Kimberly-Clark and Halyard.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kimberly-Clark's and Halyard's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Kimberly-Clark and subsequently Halyard securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Kimberly-Clark's and Halyard's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Kimberly-Clark and subsequently Halyard securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

96.     During the Class Period, Kimberly-Clark and subsequently Halyard securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kimberly-Clark and subsequently Halyard securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Kimberly-Clark and subsequently Halyard securities was substantially lower than the prices paid by Plaintiff

and the other members of the Class.  The market price of Halyard securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

97.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Halyard's securities during the Class Period, upon the disclosure that Kimberly-Clark and subsequently Halyard had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

99.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.     During the Class Period, the Individual Defendants participated in the operation and management of Kimberly-Clark and Halyard, and conducted and participated, directly and indirectly, in the conduct of Kimberly-Clark's and Halyard's business affairs.  Because of their senior positions, they knew the adverse non-public information about Kimberly-Clark's and Halyard's false statements.

101.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kimberly-Clark's and Halyard's financial condition and results of operations, and to correct promptly any

public statements issued by Kimberly-Clark or Halyard which had become materially false or misleading.

102.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kimberly-Clark and Halyard disseminated in the marketplace during the Class Period concerning Kimberly-Clark's and Halyard's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kimberly-Clark and Halyard to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Kimberly-Clark and Halyard within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kimberly-Clark and Halyard securities.

103.    Each of the Individual Defendants, therefore, acted as a controlling person of Kimberly-Clark or Halyard. By reason of their senior management positions and/or being directors of Kimberly-Clark or Halyard, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Kimberly-Clark or Halyard to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Kimberly-Clark or Halyard and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

104.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Halyard.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 28, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

# Plaintiff's Certification

I, Ronald Jackson, certify that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of

plaintiff's counsel or in order to participate in any private action arising under this title.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including

providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in the security that is the subject of the complaint during the

class period specified in the complaint are as follows:


5. Plaintiff has not sought to serve, or served, as a representative party on behalf of a class under

this title during the 3-year period preceding the date on which this certification is signed, except

as follows:
Not as an individual representative, but as a shareholder vs.
General Motors and J.P.Morgan, both still in litigation.
6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class

beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 6/17/2016



**HALYARD HEALTH INC (HYH)**                                          **Jackson, Ronald**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|------------------|
| 3/3/2015 | Purchase | 5,000 | $46.6500 |
| 3/4/2015 | Purchase | 5,000 | $45.8500 |
| 3/6/2015 | Purchase | 27 | $45.4500 |
| 3/13/2015 | Purchase | 2,473 | $46.9000 |
| 5/6/2015 | Purchase | 1,000 | $44.8000 |
| 8/27/2015 | Purchase | 2,500 | $31.2000 |