UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD JACKSON, Individually and On Behalf of All Others Similarly Situated,<br><br>Lead Plaintiff,<br><br>v.<br><br>HALYARD HEALTH, INC., ROBERT E. ABERNATHY, STEVEN E. VOSKUIL, KIMBERLY-CLARK CORPORATION, THOMAS J. FALK, and MARK A. BUTHMAN,<br><br>Defendants. | Case No. 16-CV-5093-LTS-RLE<br><br>CORRECTED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

**CORRECTED AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff Ronald Jackson ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Halyard Health, Inc. ("Halyard" or the "Company"), Halyard's former parent company Kimberly-Clark Corporation ("Kimberly-Clark"), analysts' reports and advisories about Halyard and Kimberly-Clark, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who: (1) purchased or otherwise acquired Kimberly-Clark securities on or after August 8, 2014 (the "Kimberly-Clark Class Period") and subsequently received Halyard securities pursuant to Kimberly-Clark's spin-off of Halyard, effective as of October 31, 2014; and/or (2) purchased or otherwise acquired Halyard securities between October 21, 2014 and April 29, 2016, both dates inclusive (the "Halyard Class Period" and, together with the Kimberly-Clark Class Period, the "Class Period"), seeking to recover damages from the Company and certain of its top officials, caused by their violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; Sections 11 and 15 of the Securities Act of 1933, and Item 303 of Regulation S-K [17 C.F.R. §229.303].

2. Halyard, which was spun off from Kimberly-Clark in October 2014, provides health and healthcare supplies and solutions worldwide.

3. A principal product of the Company has been its MicroCool Breathable High Performance Surgical Gowns ("MicroCool"), which are intended to protect healthcare providers from contact with highly infectious diseases like hepatitis, HIV and Ebola. At all relevant times, Defendants publicly represented that their MicroCool surgical gowns provided an "AAMI Level 4" standard of protection, which is the highest degree of protection.

4. However, the Level 4 designation was a farce. Grave deficiencies, particularly with the seams of the MicroCool gowns, allowed for leakage which rendered the user vulnerable to dangerous infectious diseases. The inability of the gowns to consistently provide the claimed

AAMI Level 4 protection was well known to Defendants during the relevant period, but was concealed from investors.

5. Defendants' failure to disclose the defects in the MicroCool gowns became even more egregious when, later that same year, an outbreak of the Ebola virus began in Guinea, subsequently spreading to other West African nations, and ultimately to at least one case in the U.S. As awareness of the Ebola epidemic grew, demand surged for the personal protective equipment ("PPE")—*i.e.*, eye shields, face masks and disposable gowns—made by Kimberly-Clark's Health Care segment and subsequently by Halyard, including the Company's MicroCool surgical gowns. Despite having full knowledge of the gowns' shocking deficiencies and rampant concern over the spread of Ebola, Defendants aggressively marketed MicroCool as providing AAMI Level 4 protection. Defendants not only misled the market but placed healthcare providers at unjustifiable risk.

6. Investors were misled by Defendants' failure to disclose that: (i) the Company's MicroCool surgical gowns consistently failed effectiveness tests and failed to meet industry standards; and (ii) Kimberly-Clark and Halyard had knowingly provided defective MicroCool surgical gowns to healthcare providers.

7. Investors learned the truth on May 1, 2016, when *60 Minutes* reported that Kimberly-Clark and Halyard had knowingly provided defective surgical gowns to U.S. workers at the height of the Ebola crisis. Bernard Vezeau, who was the global strategic marketing director for MicroCool and other products from 2012 to early 2015, admitted to *60 Minutes* that Halyard's MicroCool surgical gowns were prone to leaks and failed to meet the industry safety standards for the treatment of Ebola. Nonetheless, Kimberly-Clark and Halyard had

"aggressively" marketed the MicroCool gowns to hospitals during the epidemic. News of the *60 Minutes* report began to leak into the market on April 29, 2016.

8. On this news, Halyard stock fell 14.4%, from $31.50 on April 28, 2016 to close at $26.95 on May 2, 2016, as a direct result of leakage and broadcast of the *60 Minutes* expose.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under (i) §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o], and (ii) §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the securities of Halyard and Kimberly-Clark are traded on the NYSE, located within this District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff, as set forth in the certification filed with his motion for appointment as Lead Plaintiff, acquired Halyard securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15. Defendant Halyard is incorporated in Delaware, and the Company's principal executive offices are located at 5405 Windward Parkway, Alpharetta, Georgia 30004. On October 7, 2014, Kimberly-Clark announced the spin-off of its Health Care segment as Halyard Health, Inc., advising its shareholders that they would receive one share of Halyard Health common stock for every eight shares of Kimberly-Clark common stock held as of the close of trading on October 23, 2014, the record date for the spin-off. On or about October 21, 2014, Halyard stock began trading on the NYSE under the ticker symbol "HYH."

16. Defendant Robert E. Abernathy ("Abernathy") has served at all relevant times as Halyard's Chief Executive Officer ("CEO").

17. Defendant Steven E. Voskuil ("Voskuil") has served at all relevant times as Halyard's Chief Financial Officer ("CFO").

18. Defendant Kimberly-Clark is incorporated in Delaware, and the Company's principal executive offices are located at P.O. Box 619100, Dallas, Texas 75261.

19. Defendant Thomas J. Falk ("Falk") has served at all relevant times as Kimberly-Clark's Executive Chairman and CEO.

20. Defendant Mark A. Buthman ("Buthman") served as Kimberly-Clark's CFO from 2003 to 2015.

21. The Defendants described in ¶¶ 17-18, 20-21 are sometimes hereinafter referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22. Halyard provides health and healthcare supplies and solutions worldwide. The Company operates through two segments, Surgical and Infection Prevention ("S&IP"), and Medical Devices. Halyard markets its products directly to hospitals and other healthcare

providers, as well as through third-party distribution channels. Prior to October 2014, Halyard was the Health Care operating segment of Kimberly-Clark, a manufacturer of personal care, consumer tissue, and professional products. That segment was focused on the sale of surgical and infection prevention products for the operating room and other medical supplies, and medical devices focused on pain management, respiratory, and digestive health. Kimberly-Clark described itself as "a global leader in education to prevent healthcare-associated infections." Kimberly-Clark manufactured, marketed, and sold MicroCool from mid-2011 until the Halyard spin-off in October 2014. Following the spin-off, Halyard began to manufacture, market, and sell MicroCool.

23. Halyard was incorporated in February 2014 in anticipation of the spin-off and Kimberly-Clark transferred its healthcare business to Halyard, ***including the transfer of employees with knowledge relevant to the allegations and conduct described herein***, prior to the spinoff.

**MicroCool**

24. As stated in Halyard's SEC filings, one of its principal sources of revenue is its MicroCool surgical gowns. FDA approval to manufacture, market, and sell MicroCool was obtained through a 510(k) approval process, which is far less costly and rigorous than the FDA's Pre-Market Approval process for a device or pharmaceutical, and ***requires less supporting clinical data***.

25. The 510(k) for MicroCool, dated December 13, 2010, described MicroCool as a "sterile, single use surgical apparel intended to be worn by healthcare professionals to help protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate matter. ***The MicroCool Breathable High Performance Surgical Gowns***

***meet the Level 4 requirements of the AAMI Liquid Barrier classifications***." https://www.accessdata.fda.gov/cdrh_docs/pdf10/K103406.pdf. Emphasis added.

26. The Advancement of Medical Instrumentation ("AAMI") Standard is a system of liquid barrier performance classification for protective apparel. The AAMI Standard addresses four levels of barrier protection – ranging from Level 1 to Level 4. ***Gowns with a Level 4 classification are supposed to provide the highest liquid barrier protection defined by the AAMI Standard***.

27. The MicroCool 510(k) further represented that:

> The Kimberly-Clark MicroCool Breathable High Performance Testing: Surgical Gown, has been tested in compliance with the requirements of Level 4 liquid barrier performance requirements of ANSI/AAMI PB70[1]: 2003 "Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities." The MicroCool Breathable High Performance Surgical Gown also meets the requirements of ASTM1671[2]:2003 Standard test method for resistance of materials used in protective clothing to penetration by bloodborne pathogens using Phi-X174 bacteriophage penetration as a test system. The MicroCool* Breathable High Performance Surgical Gown meets the requirements of Flame Resistant CPSC 1610 Class 1. The MicroCool Breathable High Performance Surgical Gown has also been tested in compliance with the biocompatibility requirements of ISO 10993 for surface devices with limited contact with breached or compromised surfaces. All results of testing met acceptance criteria.

[1] ANSI/AAMI PB70 is set forth in a document published by AAMI entitled "Liquid barrier performance and classification of protective apparel and drapes intended for use in healthcare facilities." The document discusses a standard establishing minimum barrier performance requirements, a classification system, and associated labeling requirements for protective apparel, surgical drapes, and drape accessories intended for use in healthcare facilities.

[2] ASTM F1670 and ASTM F1671 refer to standard test methods for the resistance of materials used in protective clothing to penetration by synthetic blood and blood-borne pathogens. The methods are based on a test method for measuring resistance of chemical protective clothing materials to penetration by liquids. They are normally used to evaluate specimens from individual finished items of protective clothing, including gowns and their seamed and other discontinuous regions, and individual samples of materials that are candidates for items of protective clothing.

28. On May 16, 2011, Kimberly-Clark issued a press release announcing that it had been cleared by the FDA to market MicroCool as meeting the AAMI Level 4 Standard for liquid barrier protection.

29. In the press release, Kimberly-Clark's Vice President of Global Sales and Marketing, Mr. John Amat, was quoted as saying "[t]he gown delivers surgeons and surgical staff a full spectrum of protection and the assurance of barrier integrity, allowing them to concentrate solely on patient care during long and stressful procedures and not on their risk of exposure."

30. MicroCool is regulated by the FDA as a Class II medical device pursuant to 21 C.F. R § 878.4040.

**FDA Regulation 820**

31. Defendants were required to comply with FDA Regulation 820, 21 C.F.R. § 820, which governs quality system regulation ("Reg 820"), when manufacturing the MicroCool gowns. Reg 820 provides as follows:

> Current good manufacturing practice (CGMP) requirements are set forth in this quality system regulation. The requirements in this part govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use. ***The requirements in this part are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act (the act)***. This part establishes basic requirements applicable to manufacturers of finished medical devices.

21 C.F.R. § 820. Emphasis added.

32. In particular, Defendants violated Sec. 820.75 of Reg 820 which covers process validation—defined as "establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications," thus putting themselves at risk of regulatory scrutiny. Sec. 820.75 provides as follows:

> (a) Where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. The validation activities and results, including the date and signature of the individual(s) approving the validation and where appropriate the major equipment validated, shall be documented.
>
> (b) Each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met.
>
>> (1) Each manufacturer shall ensure that validated processes are performed by qualified individual(s).
>>
>> (2) For validated processes, the monitoring and control methods and data, the date performed, and, where appropriate, the individual(s) performing the process or the major equipment used shall be documented.
>
> (c) When changes or process deviations occur, the manufacturer shall review and evaluate the process and perform revalidation where appropriate. These activities shall be documented.

33. Despite having failed to "validate" MicroCool in accordance with Reg 820, as described further below, Defendants represented throughout the Class Period that its MicroCool surgical gowns provided the highest level of liquid barrier protection, AAMI Level 4, from the transfer of bodily fluids, bacteria, and infection between a patient and healthcare professional. Contrary to those representations, Defendants well knew (or at minimum recklessly ignored), that they could not validate that the manufacturing process for MicroCool gowns consistently produced gowns providing AAMI Level 4 protection, the MicroCool gowns failed industry standard tests conducted in accordance with American Society for Testing and Material ("ASTM") protocol, did not meet the relevant standards for gowns represented to be AAMI Level 4, and were unsafe as a result.

**MicroCool's Test Failures**

34. Specifically, during ASTM F1671 tests of numerous random samples taken from multiple separate manufacturing lots of the gowns, many of the MicroCool gowns tested failed to meet the standards set by AAMI Level 4. Among other things, the tests revealed that the gowns

allowed liquid, bacterial, and viral pathogens to penetrate the gowns, rendering healthcare professionals vulnerable to the transmission of serious diseases, including Ebola. As such, Defendants knew, or should have known, that MicroCool gowns did not provide the AAMI Level 4 protection promised.

35. For example, through receipt and review of a detailed Test Report completed by Adrian Buzea and Susan Tousignant of Intertek Laboratory located in Cortland, New York (Report No. G100999513CRT-001 dated December 27, 2012), Kimberly-Clark learned that during tests conducted by Intertek, one of the leading laboratories in the world, ASTM F1671 tests of approximately 96 random samples of the High Performance Gowns from multiple separate manufacturing lots were conducted, with over 48 of the gowns failing the test and no fewer than 32 of those gowns experiencing catastrophic failures. Indeed, among other things, the tests revealed that the gowns allowed liquid and bacterial and viral pathogens to penetrate the gowns, thus placing physicians, healthcare professionals and patients at considerable risk. This failure rate of approximately 50% is nothing short of shocking and greatly exceeds failure rates acceptable for satisfying AAMI Level 4 standards.

36. Indeed, Defendants admitted in their January 15, 2016 answer to a complaint filed by a group of healthcare providers and patients against Defendants alleging that the MicroCool gowns did not in fact provide AAMI Level 4 protection-- *Shahinian, et al. v. Kimberly-Clark Corporation, et al.*, No. 2:14-cv-08390-DMG-SH (C.D. Cal.)("*Shahinian*"), ***that they received the Intertek test results in January 2013***.

37. Specifically, the *Shahinian* Answer stated in relevant part:

> …in January 2013 Kimberly-Clark received a test report concerning ASTM F1671-07 testing allegedly performed on certain samples of the gowns by a third party laboratory named Intertek. The test report (which was numbered G100999513CRT-001 and dated December 27, 2012) states that the testing was

> conducted by Adrian Buzea and that the report was approved by Susan Tousignant. Kimberly-Clark received the test report from counsel for third-party Cardinal Health 200, LLC, which, upon information and belief, commissioned the Intertek testing and produced the test report to Kimberly-Clark in conjunction with then- pending litigation. The test report states that Cardinal Health provided Intertek with all gown samples, and that the samples came from three specific lots. The test report further states that "[b]y mistake one box [of gowns] was opened by a shipping/receiving technician immediately after receiving." The test report purports to show that 49 gown samples did not pass the ASTM F1671-07 testing conducted by Intertek, while the remaining gown samples passed the ASTM F1671-07 testing.

38. Nevertheless, Defendants continued to market MicroCool as providing the highest level of protection against the transmission of infectious diseases thereafter.

**Confidential Witnesses**

39. Confidential Witnesses confirmed that, in violation of Reg 820, Defendants could not properly validate the process for manufacturing MicroCool gowns to ensure that the process would consistently yield gowns that in fact provided AAMI Level 4 protection. This is evidenced by the vast amount of MicroCool gowns that failed to demonstrate AAMI Level 4 protection during independent testing.

40. Confidential Witness ("CW") 1 was an Administrative Assistant in the Global Strategic Marketing department at Halyard from April 2013 to March 2015. CW1 reported to the Director of Global Strategic Marketing, until he left the company in 2014. Thereafter, CW1 reported to the Director of Global Strategic Marketing's boss. Specifically, CW1 worked within the S&IP division, which included MicroCool gowns as well as other products such as face masks, gloves and other gowns. According to CW1, MicroCool had problems with the seams, which led to the sleeves on the gowns separating from the seams. CW1 recalled that healthcare professional customers filed complaints about the seam problems. CW1 learned about the seam problems with the MicroCool gowns by attending meetings with senior leadership of the company where the issue was discussed "quite a bit."

41. CW2 was an Engineering and Project Manager at Kimberly-Clark's manufacturing plant in Villanueva, Honduras from 2009 to November 2014. From 2005 to 2009, CW2 was Technical Team Leader, which was the same job but with a different title. CW2 reported locally to the plant manager during the last few years of employment. CW2 also reported to the Research and Engineering Department in the Company's corporate headquarters in Georgia. According to CW2, all of the MicroCool gowns were put together at the Honduras plant from fabric manufactured at the Company's plant in Corinth, Mississippi. Rolls of the fabric were shipped to the Kimberly-Clark plant in Honduras, where it was cut and "converted" into the gowns. CW2 explained that some parts of the gown were sewn together with special thread. For example the cuffs were sewn to the sleeves and the sleeves were sewn to the body of the gown. According to CW2, creating a tubular sleeve from a flat piece of fabric was done with a thermal sealing process at the plant. The two ends of a piece of sleeve fabric were heated and pressed together so that the exterior parts of the fabric sealed together. CW2 stated that once a tubular sleeve was created, it was sewn on to the body of the gown.

42. CW2 was involved with developing a sleeve sealing process for the MicroCool gowns. CW2 stated that the gown sleeve sealing process at the Honduras plant could not be relied upon to consistently perform as expected and produce gowns that would pass the AAMI 1671 test required for Level 4 protection. Indeed, CW2 maintained that the sleeve sealing process at the Honduras plant was incapable of being validated due to its unreliability, though such validation was required under FDA 820 regulations.

43. CW2 stated that CW2, and other members of the Research and Engineering team reported the sleeve sealing problems to senior management in both Honduras and the United States. CW2 stated that the unreliability of the sealing process was "well known at the

company." Among others, CW2 relayed these issues to Bernard Vezeau, the now-deceased Global Strategic Marketing Director interviewed on *60 minutes* regarding the MicroCool gowns.

44. According to CW2, during a teleconference on which CW2 told senior managers about the unreliable sleeve sealing process at the plant, the Director of Product Supply told CW2 to "shut up and keep going and make it work."

45. CW2 stated that, beginning in 2009, the company sent samples of its MicroCool gowns each month for AAMI 1671 testing to Intertek labs, which is testing done to determine if gowns meet Level 4 protection standards. The 1671 testing involved placing synthetic blood and bacteria at specific places on the gown, including the sleeve seam, the ties and on the front fabric. If the blood soaks through or the bacteria grow on the other side within a certain time period, the sample fails.

46. CW2, who received the test results each month, said the monthly test results showed the samples were failing on a regular basis, including at the sleeve seal. The results regularly showed gowns failing tests at a rate of between 10 and 35 percent. The Intertek test results showed failure rates that did not meet minimum standards required for AAMI Level 4 protection. The Intertek test results were emailed to the Company's quality department. The test failures and problems with the sleeve sealing process were discussed in meetings with senior management that CW2 attended. The failed test results did not prompt the Company to stop production, recall gowns or improve its sealing process.

47. CW2 and members of CW2's team were "not comfortable" with using the sleeve sealing process in place at the Honduras plant. CW2 stated that he had asked for support from the Company to fix the sealing process for many years.

48. CW2 confirmed that the Company was fully aware that its sleeve sealing process was unreliable but nevertheless sold the MicroCool gowns as offering AAMI Level 4 protection.

**Materially Misleading Statements and Omissions Issued During the Class Period**

49. Throughout the Class Period, Defendants publicly represented on the Companies' websites, in publicly disseminated marketing materials, and on product labelling that MicroCool provided an AAMI Level 4 standard of protection. At no point did Defendants disclose that the manufacturing process for MicroCool could not be validated as required by Reg 820 and that a shocking amount of gowns failed independent testing and thus did not provide the AAMI Level 4 protection indicated in the 510(k) filing with the FDA or as otherwise publicly represented.

50. In March 2014, the WHO reported that Guinea's Ministry of Health had reported an outbreak of Ebola virus in four southeastern districts, and that suspected cases in the neighboring countries of Sierra Leone and Liberia were under investigation. Despite knowing that a sizable portion of its MicroCool surgical gowns failed independent testing and thus did not provide AAMI Level 4 protection as publicly promised, Defendants took advantage of the Ebola scare and aggressively continued to market MicroCool as providing the highest level of protection for healthcare providers treating patients with Ebola.

51. On or around August 8, 2014, following an Emergency Committee meeting, the WHO designated the outbreak as a Public Health Emergency of International Concern, a rarely-used designation that invokes legal measures on disease prevention, surveillance, control, and response, by 194 signatory countries.

52. With concern over Ebola at a fever pitch, Defendants continued to represent that MicroCool gowns were safe to use around patients suspected of contracting the Ebola virus. Indeed, Kimberly-Clark's website stated as follows:

> As concerns around the spread of the Ebola virus continue to grow, the number of inquiries we receive regarding recommendations for PPE [i.e., "Personal Protective Equipment"] and our plans for Pandemic Preparedness are growing in tandem. Therefore, we want to proactively provide you with guidance on preparing for a pandemic as well as solutions for proper PPE. We are providing you with a clinical Kimberly-Clark Ebola Virus Precautions Brief and a Kimberly-Clark Personal Protection Solutions guide as well as other resources to answer questions you have about the Ebola Virus Disease.

Below this statement on its website, Kimberly-Clark shared a link inviting visitors to download the "Kimberly-Clark Personal Protection Solutions Guide," which advised healthcare facilities to use the High Performance Gowns in connection with treating patients who may be infected with the Ebola virus.

53. Moreover, on August 14, 2014, Kimberly-Clark published a Pandemic Preparedness Customer Letter (the "Customer Letter"). In the Customer Letter, Kimberly-Clark stated, in part:

> Kimberly-Clark joins the world in the hope for the cessation of the spread of the virus and the discovery of a cure. While the transmission of the virus in West Africa has captured the attention of the world and increased anxiety about its potential to spread into North America, we want you to rest assured that Kimberly-Clark has activated its Pandemic Preparedness Plan which provides protocols for tracking the cadence of orders and monitoring supply of our critical Personal Protection Equipment products (PPE) including facial protection, exam gloves and protective apparel.

54. Further, on September 19, 2014, Kimberly-Clark issued a document entitled "Kimberly-Clark Ebola Virus Disease (EVD) Precautions Brief." In this document, Kimberly-Clark provided a list of recommendations for "Personal Protection" from the Ebola virus, as well as the use of "appropriate personal protective equipment (PPE)." With respect to surgical gowns, Kimberly-Clark advised healthcare professionals to use "Level 4" gowns—the represented clearance level for the High Performance Gowns—for working with Ebola patients.

55. On September 30, 2014, the CDC declared the first case of Ebola virus in the United States.

56. On October 7, 2014, Kimberly-Clark announced the details for the completion of the spin-off of its Health Care segment, advising investors that they would receive one share of Halyard common stock for every eight shares of Kimberly-Clark common stock held as of the close of trading on October 23, 2014, the record date for the spin-off. On or about October 21, 2014, Halyard stock began trading on the NYSE under the ticker symbol "HYH."

57. On October 10, 2014, AAMI issued a press release entitled "Surgery Protocol for Ebola Includes AAMI Gown Standard." In the press release, AAMI recommended that surgeons and healthcare professionals wear "AAMI Level 4" surgical gowns and drapes when operating on suspected or confirmed Ebola patients. Defendants continued to publicly represent that their MicroCool gowns qualified.

58. On October 21, 2014, the American College of Surgeons issued a statement echoing the AAMI guidance by advising that due to the significant risk of exposure to blood or bodily fluids, all operating room personnel should wear "AAMI Level 4" impervious surgical gowns. Despite the clear and present risk, Defendants continued to represent to the public that its gowns provided "AAMI Level 4" protection, meeting critical industry standards for impermeability, and that gowns manufactured and distributed by Defendants were therefore safe for contact with Ebola patients.

59. ***That same day,*** on October 21, 2014, Kimberly-Clark filed a Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 with the SEC (the "Kimberly-Clark Q3 2014 10-Q"). With respect to its Health Care segment, Kimberly-Clark stated, in part:

> *Health Care* provides essentials that help restore patients to better health and improve the quality of patients' lives. This segment offers ***surgical and infection prevention*** products for the operating room, and a portfolio of innovative medical devices focused on pain management, respiratory and digestive health. This business is a global leader in education to ***prevent healthcare-associated infections***.

Emphasis added.

60. The Kimberly-Clark Q3 2014 10-Q contained signed certifications by Defendants Falk and Buthman, stating that the Kimberly-Clark Q3 2014 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

61. On October 21, 2014, Halyard issued a press release and filed a Current Report on Form 8-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Halyard Q3 2014 8-K"). Attached as an exhibit to that 8-K was a letter to Halyard stockholders, which identified the MicroCool gown as one of Halyard's "more important marks." In the 8-K, the Company also stated that its MicroCool gowns are "innovative, cost-effective and high quality products."

62. On October 31, 2014, *Reuters* published an article entitled "Halyard Health poised to shine in debut on back of Ebola scare." The *Reuters* article stated, in part: "Since Ebola was first diagnosed in the United States, demand has surged for the eye shields, face masks and disposable gowns made by Halyard Health Inc., which is set to make its market debut on Monday. . . . The Ebola outbreak—and fear of its spread in developed countries—is certain to spur growth in demand for Halyard's products in the near future."

63. Upon information and belief, at all relevant times the Ebola Preparedness section of Halyard's website stated that the Company "want[ed] to proactively provide you with guidance on preparing for a pandemic as well as solutions for proper PPE," and included a link to the Halyard Personal Protection Solutions Guide (the "Personal Protection Guide"), a list of Halyard's PPE products. The Personal Protection Guide recommended Halyard's MicroCool Surgical Gowns as a solution that offered "AAMI Level 4 / Liquid Barrier Protection." By the

AAMI Level 4 designation, Halyard represented that its MicroCool Surgical Gowns provided adequate protection for situations that entailed a high exposure risk in terms of "fluid amount," "fluid spray or splash" and "pressure on gown" per the guidelines established by the Association for the Advancement of Medical Instrumentation.

64. On November 11, 2014, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended September 30, 2014 (the "Halyard Q3 2014 10-Q"). In the Halyard Q3 2014 10-Q, the Company stated, in part:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

(Emphases added.)

65. The Halyard Q3 2014 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Halyard Q3 2014 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

66. On March 13, 2015, Halyard filed its Annual Report for the quarter and year ended December 31, 2014 on Form 10-K with the SEC (the "2014 10-K"). In the 2014 10-K, Halyard reiterated the misleading statements from the Halyard Q3 2014 10-Q and also stated:

> In our S&IP business, we are focused on maintaining our market position by providing innovative customer-preferred product enhancements, with a particular focus on the operating room. Leveraging customer insights and our vertically integrated manufacturing capabilities, we seek to continuously improve our product designs, specifications and features to deliver cost efficiencies while improving healthcare worker and patient protection.

(Emphases added.)

67. The 2014 10-K, which identified MicroCool as a "principal source of revenue" in Halyard's S&IP business segment, contained signed certifications by Defendants Abernathy and Voskuil, stating that the 2014 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

68. On May 5, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). In the Q1 2015 10-Q, the Company reiterated the misleading statements contained in the Halyard Q3 2014 10-Q.

69. The Q1 2015 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Q1 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

70. On August 12, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). In the Q2 2015 10-Q, the Company reiterated the misleading statements contained in the Halyard Q3 2014 10-Q.

71. The Q2 2015 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Q2 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

72. On November 4, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q reiterated the misleading statements contained in the Halyard Q3 2014 10-Q.

73. The Q3 2015 10-Q contained signed certifications by Defendants Abernathy and Voskuil, stating that the Q3 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

74. On February 29, 2016, Halyard filed its Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2015 (the "2015 10-K"). In the 2015 10-K, Halyard reiterated the misleading statements contained in the Halyard Q3 2014 10-Q and also stated, in part:

> In our S&IP business, we are focused on maintaining our market position by providing innovative customer-preferred product enhancements, with a particular focus on the operating room. Leveraging customer insights and our vertically integrated manufacturing capabilities, we seek to continuously improve our product designs, specifications and features to deliver cost efficiencies while improving healthcare worker and patient protection. We continuously refresh our surgical drape and gown portfolio to ensure that our products are aligned with the latest procedural and market trends. Our research team works with healthcare providers to develop and design exam glove and apparel portfolios that optimize comfort and fit and provide cost-effective infection prevention solutions for use throughout the hospital.

(Emphases added.)

75. The 2015 10-K once again identified MicroCool as a principal source of revenue within its S&IP segment.

76. The Company continued to market MicroCool as providing AAMI Level 4 protection.

77. The 2015 10-K contained signed certifications by Defendants Abernathy and Voskuil, stating that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

78. The statements referenced above were materially false and misleading because Defendants failed to disclose that: (i) the Company's MicroCool surgical gowns consistently failed effectiveness tests and failed to meet industry standards; (ii) Kimberly-Clark and Halyard had knowingly provided defective MicroCool surgical gowns to healthcare providers; and (iii) as a result of the foregoing, Defendants' public statements were materially misleading and omitted material information at all relevant times.

**The Truth Emerges**

79. On May 1, 2016, *60 Minutes* reported that Kimberly-Clark and Halyard had knowingly provided defective surgical gowns to U.S. workers at the height of the Ebola crisis. In an interview with Anderson Cooper, Bernard Vezeau, the global strategic marketing director for MicroCool and other products from 2012 to early 2015 (first at Kimberly-Clark, later at Halyard), stated that "the company went into high gear to sell the product" despite knowing that "the gowns were not consistently meeting industry standards."

> Anderson Cooper: ***These gowns were being recommended for use with Ebola.***
>
> Bernard Vezeau: Aggressively being recommended.
>
> Anderson Cooper: In what way aggressively?
>
> Bernard Vezeau: ***We put a full court press to drive MicroCool sales***. We told hospitals to stock up on our MicroCool products. We told 'em to have at least 8 to 12 weeks of product on hand. And that's when things became very difficult for me.
>
> . . .
>
> Bernard Vezeau: There is a test. And it's conducted in outside facilities.
>
> Anderson Cooper: So ***did your gowns consistently pass this test?***
>
> Bernard Vezeau: ***No, they did not.***
>
> . . .

> Anderson Cooper: Did you receive complaints from nurses, from surgeons at all?
>
> Bernard Vezeau: On these gowns?
>
> Anderson Cooper: Yeah.
>
> Bernard Vezeau: Oh, frequently. On a very frequent basis.
>
> Anderson Cooper: What kinda complaints?
>
> Bernard Vezeau: Oh, ***complaints of strike-through, sleeves falling off, ties falling off.***
>
> Anderson Cooper: Sleeves falling off.
>
> Bernard Vezeau: Sleeves falling off. Sleeves falling off during a procedure.
>
> Anderson Cooper: Were you at meetings where these problems were discussed?
>
> Bernard Vezeau: Every time. ***We were the ones who were telling senior management the problems that we were having.***

(Emphases added.)

80. The *60 Minutes* report also described an independent test in December 2012, requested by Cardinal Health, Inc., a competitor of Kimberly-Clark and later of Halyard, in which 77% of the MicroCool gowns tested failed. The report also described February and March 2013 tests and laboratory reports, requested by Kimberly-Clark, in which some 21% of the MicroCool gowns tested failed, and in which some samples submitted "weren't even tested because the sleeves were so bad. The lab took [the sleeves] out of the package and they were so bad that they didn't even test [them] because it was obvious what was going to happen."

81. The *60 Minutes* report also referenced an internal Halyard PowerPoint presentation from November 2014 "that identifies a year-and-a-half 'gap in sleeve seams passing' the industry test," which Halyard's Chief Operating Officer, Chris Lowery, acknowledged having seen. Halyard advised *60 Minutes* that "[b]y January 2015 . . . [the

Company] had new sealing machines in place to improve the quality of its sleeves," an acknowledgment that the manufacturing processes for the Company's MicroCool gowns had previously been inadequate.

82. Promotions of the *60 Minutes* segment regarding MicroCool began to leak into the market on April 29, 2016. That same day the Company issued a statement in which it continued to "express confidence in the safety and efficacy of the MicroCool gown."

83. On this news, Halyard stock fell 14.4%, from $31.50 on April 28, 2016 to close at $26.95 on May 2, 2016, as a direct result of leakage and broadcast of the *60 Minutes* expose.

84. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

85. During the Class Period, and prior to the spinoff of Halyard, Defendant Falk received $67,036,901 in proceeds from his sales of Kimberly-Clark stock. For that same period, Defendant Buthman received $8,802,174 in proceeds from his sales of Kimberly-Clark stock. These sales were abnormal as compared to previous sales of Kimberly-Clark stock by these Individual Defendants.

86. During the Class Period, MicroCool represented a principal source of revenue for Halyard. Defendants, core executives of the Company, received a report from Intertek in January 2013 proving that a large amount of the gowns failed testing for AAMI Level 4 protection. In addition, confidential witnesses stated that the issues with the gowns, predominantly with the shoulder seams, were well known throughout the Company and often discussed in meetings with senior executives, which included the Individual Defendants. Issues

regarding the Company's inability to "validate" the manufacturing process for MicroCool to ensure production of gowns consistently providing AAMI Level 4 protection were escalated to senior management during the Class Period, and summarily ignored. Nevertheless, in order to take advantage of the Ebola scare, rather than fix the issues, Defendants doubled down on their misleading statements and pursued an aggressive marketing campaign focused on MicroCool's AAMI Level 4 designation.

87. Lead Plaintiff reincorporates paragraphs 34-48 herein as supporting a compelling inference of Defendants' scienter.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

88. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who (1) purchased or otherwise acquired Kimberly-Clark securities on or after August 8, 2014 and subsequently received Halyard securities pursuant to Kimberly-Clark's spin-off of Halyard, effective as of October 31, 2014, and/or (2) purchased or otherwise acquired Halyard securities between October 21, 2015 and April 29, 2016; and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kimberly-Clark and subsequently Halyard securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the

proposed Class. Record owners and other members of the Class may be identified from records maintained by Halyard, Kimberly-Clark or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

92. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Kimberly-Clark and/or Halyard;
- whether the Individual Defendants caused Kimberly-Clark and/or Halyard to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Kimberly-Clark and/or Halyard securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

94. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Kimberly-Clark and Halyard securities are traded in an efficient market;
- Kimberly-Clark's and Halyard's shares were liquid and traded with moderate to heavy volume during the Class Period;
- Kimberly-Clark and Halyard traded on the NYSE and were covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Kimberly-Clark's and Halyard's securities; and
- Lead Plaintiff and members of the Class purchased, acquired and/or sold Kimberly-Clark and/or Halyard securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

95. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

96. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

97. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, along with Item 303 of Regulation S-K [17 C.F.R. §229.303].

99. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kimberly-Clark and subsequently Halyard securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Kimberly-Clark and subsequently Halyard securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

100. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Kimberly-Clark and/or Halyard securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Kimberly-Clark's and/or Halyard's finances and business prospects.

101. By virtue of their positions at Kimberly-Clark and Halyard, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

102. The adverse events and uncertainties associated with the trends described above were reasonably likely to have a material impact on Halyard's profitability and, therefore, were required to be disclosed pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto.

103. Defendants therefore violated Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, which requires management to "describe any

known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

104. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Kimberly-Clark and/or Halyard, the Individual Defendants had knowledge of the details of the companies' internal affairs.

105. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Kimberly-Clark and Halyard. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kimberly-Clark's and Halyard's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Kimberly-Clark and subsequently Halyard securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Kimberly-Clark's and Halyard's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Kimberly-Clark and subsequently Halyard securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

106. During the Class Period, Kimberly-Clark and subsequently Halyard securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kimberly-Clark and subsequently Halyard securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Kimberly-Clark and subsequently Halyard securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Halyard securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

107. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Halyard's securities during the Class Period, upon the disclosure that Kimberly-Clark and subsequently Halyard had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the**
**Exchange Act Against The Individual Defendants)**

109. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110. During the Class Period, the Individual Defendants participated in the operation and management of Kimberly-Clark and Halyard, and conducted and participated, directly and indirectly, in the conduct of Kimberly-Clark's and Halyard's business affairs. Because of their senior positions, they knew the adverse non-public information about Kimberly-Clark's and Halyard's false statements.

111. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kimberly-Clark's and Halyard's financial condition and results of operations, and to correct promptly any public statements issued by Kimberly-Clark or Halyard which had become materially false or misleading.

112. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kimberly-Clark and Halyard disseminated in the marketplace during the Class Period concerning Kimberly-Clark's and Halyard's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kimberly-Clark and Halyard to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Kimberly-Clark and Halyard within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in

the unlawful conduct alleged which artificially inflated the market price of Kimberly-Clark and Halyard securities.

113. Each of the Individual Defendants, therefore, acted as a controlling person of Kimberly-Clark or Halyard. By reason of their senior management positions and/or being directors of Kimberly-Clark or Halyard, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Kimberly-Clark or Halyard to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Kimberly-Clark or Halyard and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

114. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Halyard.

**COUNT III**

**(Violations of Section 11 of the Securities Act Against Defendants)**

115. The following allegations are in effect a separate complaint. For the following claims there is no allegation of fraud, scienter or recklessness. These claims, brought under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, and 77o and Item 303 of Regulation S-K [17 C.F.R. §229.303] are based solely on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent Defendants' investigation into the true facts.

116. These Securities Act claims expressly do not make any allegations of fraud or scienter. These Securities Act claims are not based on any allegation that any Defendant engaged

in fraud or any other deliberate and intentional misconduct, and the Lead Plaintiff specifically disclaims any reference to or reliance on fraud allegations.

117. At the time of the Halyard spin-off, the adverse events and uncertainties associated with the trends described above were reasonably likely to have a material impact on Halyard's profitability and, therefore, were required to be disclosed in the Registration Statement pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto.

118. Defendants therefore violated Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, which requires management to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

119. Throughout the Class Period, Defendants had a duty to disclose uncertainties regarding the MicroCool gown and the material impact on the Company's profitability that would likely occur as a result of the gowns' grave deficiencies.

120. The Registration Statement for the spin-off was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

121. At the time of their purchases or acquisition of Halyard stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the

disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff commenced this action.

122. By reason of the conduct herein alleged, each defendant violated §11 of the Securities Act are liable to Class Members.

**COUNT IV**

**(For Violation of Section 15 of the Securities Act Against Halyard and the Individual Defendants)**

123. This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against Halyard and the Individual Defendants.

124. The Individual Defendants each were control persons of Halyard by virtue of their positions as directors and/or senior officers of Halyard. The Company controlled the Individual Defendants and all of Halyard's employees.

125. The Individual Defendants were each culpable participants in the violations of §11 of the Securities Act alleged in Count III above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the spin-off to be successfully completed. Halyard was a culpable participant in the violations of §11 of the Securities Act alleged in Count III above, based on its control of the Individual Defendants and having otherwise participated in the process which allowed the spin-off to be successfully completed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated: December 12, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Lead Plaintiff***