UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

RONALD JACKSON, individually and on
behalf of all others similarly situated,

        Plaintiff,

    -v-                            No. 16-CV-05093-LTS

HALYARD HEALTH, INC., ROBERT E.
ABERNATHY, STEVEN E. VOSKUIL,
KIMBERLY-CLARK CORPORATION,
THOMAS J. FALK, and MARK A.
BUTHMAN,

        Defendants.

--------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

        Plaintiff Ronald Jackson ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings this putative federal securities class action against Halyard Health, Inc. ("Halyard"), former Halyard Chief Executive Officer ("CEO") Robert E. Abernathy ("Abernathy"), Halyard Chief Financial Officer ("CFO") Steven E. Voskuil ("Voskuil," together with Abernathy, the "Halyard Individual Defendants," and together with Abernathy and Halyard, the "Halyard Defendants"), Kimberly-Clark Corporation ("Kimberly-Clark"), Kimberly-Clark Executive Chairman and CEO Thomas J. Falk ("Falk"), and Former Kimberly-Clark CFO Mark A. Buthman ("Buthman," together with Falk, the "Kimberly-Clark Individual Defendants," and together with Falk and Kimberly-Clark, the "Kimberly-Clark Defendants") on behalf of a proposed class consisting of all persons other than Defendants who: (1) purchased or otherwise acquired Kimberly-Clark securities on or after August 8, 2014 (the "Kimberly-Clark Class Period") and subsequently received Halyard securities pursuant to Kimberly-Clark's spinoff of

Halyard, effective as of October 31, 2014; and/or (2) purchased or otherwise acquired Halyard securities between October 21, 2014 and April 29, 2016, both dates inclusive (the "Halyard Class Period" and, together with the Kimberly-Clark Class Period, the "Class Period"), seeking to recover damages, allegedly caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated under Section 10(b).[1]  (Corrected Amended Class Action Complaint ("CACAC"), Docket Entry No. 50.)

The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

Before the Court are two motions to dismiss the remaining two counts of the CACAC, one filed by the Halyard Defendants and one filed by the Kimberly-Clark Defendants, as well as a motion by Plaintiff to strike two exhibits filed in connection with the Halyard Defendants' motion.  (See Docket Entry Nos. 55, 58, and 67.)  The Court has reviewed thoroughly all of the parties' submissions.  For the following reasons, Defendants' motions to dismiss are granted in their entirety, and Plaintiff's motion to strike is denied as moot in light of the disposition of the Defendants' motions to dismiss.

---

[1]     Plaintiff's CACAC, filed on December 12, 2016, also includes claims for relief for violations of Sections 11 and 15 of the Securities Act of 1933, and on February 13, 2017, the Court ordered those claims, Counts III and IV, dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), following the submission of a stipulation and agreement by the parties.  (Docket Entry No. 52.)

For the purposes of these motions, the Court takes as true the following facts drawn from the CACAC (Docket Entry No. 50), the documents incorporated by reference therein, and public filings of which the Court may take judicial notice.[2]

The Parties

Halyard sells health and healthcare supplies and solutions around the world, including the MicroCool Breathable High Performance Surgical Gown ("MicroCool"), a product "intended to protect healthcare providers from contact with highly infectious diseases like hepatitis, HIV and Ebola." (CACAC ¶¶ 2-4.) Halyard markets its products to hospitals and healthcare providers, and through third-party distribution channels. (Id. ¶ 22.) In October 2014, Halyard was spun off from Kimberly-Clark, a personal care, consumer tissue and professional products manufacturer, where it was the Health Care operating segment, focused on, among other priorities, the sale of surgical and infection prevention products for the operating room. (Id.) On or about October 21, 2014, Halyard stock began trading on the New York Stock Exchange, and Kimberly-Clark shareholders "receive[d] one share of Halyard common stock for every eight shares of Kimberly-Clark common stock held as of the close of trading on October 23, 2014, the record date for the spin-off." (Id. ¶ 15.) MicroCool was manufactured, marketed, and sold first by Kimberly-Clark, from mid-2011 until the spin-off, and then by Halyard, from October 2014 up through the time of the initiation of this action. (Id. ¶ 22.)

---

[2]     See Citadel Equity Fund Ltd. v. Aqulia, Inc., 168 F. App'x 474, 476 (2d Cir. 2006) (holding that SEC filings are amenable to judicial notice).

Mr. Abernathy served at all relevant times as Halyard's CEO, and Mr. Voskuil served at all relevant times as Halyard's CFO.  (Id. ¶¶ 16-17.)  Mr. Falk served at all relevant times as Kimberly-Clark's Executive Chairman and CEO, and Mr. Buthman served as Kimberly-Clark's CFO from 2003 to 2015.  (Id. ¶¶ 19-20.)

Plaintiff alleges that he "acquired Halyard securities at artificially inflated prices during the Class Period and was damaged upon the revelation of" certain "alleged corrective disclosures."  (Id. ¶ 14.)

MicroCool and AAMI Level 4 Classification

Kimberly-Clark received approval to manufacture, market, and sell MicroCool from the Food and Drug Administration ("FDA") "through a 510(k) approval process," which is allegedly a "far less costly and rigorous" process "than the FDA's Pre-Market Approval process for a device or pharmaceutical, and requires less supporting clinical data."  (Id. ¶ 24 (emphasis omitted).)  The MicroCool 510(k) summary, prepared on December 13, 2010, and filed by Kimberly-Clark, states that MicroCool meets the Level 4 requirements of the Association for the Advancement of Medical Instrumentation ("AAMI") Liquid Barrier classification, a system of liquid barrier performance classification for protective apparel.  (Id. ¶¶ 25-26 (quotation marks omitted) (quoting https://www.accessdata.fda.gov/cdrh_docs/pdf10/K103406.pdf).)  Level 4 "provide[s] the highest liquid barrier protection defined by the AAMI" system.  (Id. ¶ 26.)  The December 2010 summary further represented that MicroCool had been "tested in compliance with the requirements of" a variety of tests that can demonstrate Level 4 performance, including specifications set forth in a document discussing the standards for establishing minimum barrier performance, and ASTM F1670/F1671, standard test methods for "measuring the resistance of"

materials used in protective clothing "to penetration by liquids."  (Id. ¶ 27, n. 1-2.)  Kimberly-Clark announced on May 16, 2011, that the FDA allowed it to market MicroCool as meeting the AAMI Level 4 standard.  (Id. ¶ 28.)

Plaintiff alleges that Defendants were required to comply with FDA Regulation 820 ("Reg. 820"), 21 C.F.R. § 820, "which governs quality system regulation," and that Defendants violated Sec. 820.75 of Reg. 820, which requires manufacturers to "establish[] by objective evidence that a process consistently produces a result or product meeting its predetermined specifications."  (Id. ¶ 32.)  Plaintiff alleges that Defendants "failed to 'validate' MicroCool in accordance with Reg[.] 820," by failing to establish through objective evidence the existence of a manufacturing process that produced consistent results, and violated Reg. 820 on an ongoing basis because a sleeve-sealing process at the manufacturing plant was so unreliable as to be incapable of validation.  (Id. ¶¶ 32-33, 42.)  Plaintiff does not allege that Reg. 820 required any specific government or public reporting.

Alleged MicroCool Deficiencies and Scienter Allegations

According to Plaintiff, "many" MicroCool gowns failed to meet the standards required to meet the AAMI Level 4 standard "during ASTM F1671 tests of numerous random samples taken from multiple separate manufacturing lots of the gowns."  (Id. ¶ 34.)  Plaintiff does not allege the specific time period during which certain MicroCool gowns failed AAMI Level 4 tests.  Plaintiff does proffer a detailed test report completed by Intertek Laboratory, dated December 27, 2012 (the "Intertek Report"), a full two years after Kimberly-Clark prepared its 510(k) summary, as an example, and alleges that Kimberly-Clark learned when it received those test results in January 2013 that, "of approximately 96 random samples of the" gowns, "over 48"

gowns failed the test and "no fewer than 32 of those gowns experienc[ed] catastrophic failures." (Id. ¶¶ 35-36.)  Plaintiff alleges that, following receipt of this report, Defendants "continued to market MicroCool as providing the highest level of protection against the transmission of infectious diseases."  (Id. ¶ 38.)

Plaintiff alleges that, in addition to the Intertek Report, two confidential witnesses ("CWs") "confirm" that, as a "vast amount of MicroCool gowns . . . failed to demonstrate AAMI Level 4 protection during independent testing," the "Defendants could not properly validate the process for manufacturing MicroCool gowns to ensure that the process would consistently yield gowns that in fact provided AAMI Level 4 protection."  (Id. ¶ 39.)  These CWs are alleged to be an individual who worked as an administrative assistant in Halyard's Global Strategic Marketing department from April 2013 to March 2015 ("CW1"), who reported to first the Director of Global Strategic Marketing and then to that position's manager, and an individual who was first a Technical Team Leader, from 2005 to 2009, and then an Engineering and Project Manager at Kimberly-Clark's manufacturing plant in Villanueva, Honduras, from 2009 to November 2014 ("CW2").  (Id. ¶¶ 40-41.)

According to CW1, MicroCool had problems with sleeves separating from seams, which led health care professional customers to file complaints.  (Id. ¶ 40.)  Plaintiff alleges that CW1 attended meetings with "senior leadership of the company where the issue was discussed 'quite a bit.'"  (Id.)

Plaintiff alleges that "CW2 was involved with developing a sleeve sealing process for the MicroCool gowns," and that "the sleeve sealing process at the Honduras plant [at which MicroCool gowns were assembled] could not be relied upon to consistently perform as expected and produce gowns that would pass the AAMI 1671 test required for Level 4 protection."  (Id. ¶

42.)  According to CW2, he, together with "members of the Research and Engineering team [at the Honduras facility,] reported the sleeve sealing problems to senior management in both Honduras and the United States," including Kimberly-Clark's Global Strategic Marketing Director, at an unspecified time, and that the problems were "'well known at the company.'"  (Id. ¶ 43.)  Plaintiff proffers that CW2 alleges that, after the Director of Product Supply was advised of the "unreliable sleeve sealing process at the plant" during a teleconference, that individual "told CW2 to 'shut up and keep going and make it work.'"  (Id. ¶ 44.)  CW2 also alleges that, beginning in 2009, Kimberly-Clark sent MicroCool samples to Intertek labs each month to determine if the gowns continued to meet Level 4 protection standards, and that CW2 received the monthly test results.  (Id. ¶¶ 45-46.)  Plaintiff alleges, based on information from CW2, that the "results regularly showed gowns failing tests at a rate of between 10 and 35 percent" and that those rates "did not meet minimum standards required for AAMI Level 4 protection."  (Id. ¶ 46.)  Plaintiff further alleges that the results were shared with Halyard's "quality department," and "were discussed in meetings" with unspecified "senior management that CW2 attended."  (Id.)  Plaintiff alleges, based on information from CW2, that "CW2 confirmed that [Halyard] was fully aware that its sleeve sealing process was unreliable but nevertheless sold the MicroCool gowns as offering AAMI Level 4 protection."  (Id. ¶ 48.)

Plaintiff further alleges that, during the Class Period and prior to the spinoff of Halyard, Mr. Falk received $67,036,901 in proceeds from his sales of Kimberly-Clark stock, and Mr. Buthman received $8,802,174 in proceeds from his sales of Kimberly-Clark stock, sales that "were abnormal as compared to previous sales of Kimberly-Clark stock by" those individuals. (Id. ¶ 85.)

<u>Alleged Materially Misleading Statements and Omissions Issued During the Class Period</u>

Plaintiff alleges that, "[t]hroughout the Class Period," "Defendants publicly represented on [Halyard and Kimberly-Clark's] websites, in publicly disseminated marketing materials, and on product [labeling] that MicroCool provided an AAMI Level 4 standard of protection" amidst a global outbreak of the Ebola virus in 2014. (<u>Id.</u> ¶ 49.) Specifically, Plaintiff alleges that Kimberly-Clark marketed its "Personal Protection Equipment," including MicroCool, for "pandemic preparedness" purposes on its website at an unspecified point in time, in a published letter to customers on August 14, 2014, and in a "Kimberly-Clark Ebola Virus Disease . . . Precautions Brief" on September 19, 2014. (<u>Id.</u> ¶¶ 52-54.) At all relevant times, Halyard's website included a Personal Protection Guide for preparation for a pandemic that recommended MicroCool "as a solution that offered 'AAMI Level 4 / Liquid Barrier Protection[,]'" and represented that the gowns "provided adequate protection for situations that entailed a high exposure risk in terms of 'fluid amount,' 'fluid spray or splash' and 'pressure on gown[.]'" (<u>Id.</u> ¶ 63.)

Plaintiff complains that, in a number of public filings with the Securities and Exchange Commission ("SEC"), ranging from October 21, 2014, to February 29, 2016, Kimberly-Clark and Halyard failed to disclose that MicroCool "consistently failed effectiveness tests and failed to meet industry standards," that the companies "had knowingly provided defective MicroCool surgical gowns to healthcare providers," and that "the public statements were materially misleading and omitted material information at all relevant times." (<u>See</u> <u>id.</u> ¶¶ 59-78.) Plaintiff alleges that Kimberly-Clark and Halyard made representations about the companies' health care segment, including that it "offer[s] surgical and infection prevention products for the operating room" and "is a global leader in education to prevent healthcare-

associated infections," and that the MicroCool gown is one of Halyard's "more important marks," is "innovative, cost-effective and [a] high quality product[]," and is a "principal source of revenue" for Halyard.  (See id. ¶¶ 59, 61, 67, 74.)  Plaintiff alleges that the public filings at issue contained signed certifications by the Kimberly-Clark Individual Defendants and Halyard Individual Defendants (together, the "Individual Defendants").  (Id. ¶¶ 60, 65, 67, 69, 71, 73, 77.)

Alleged Harm to Investors and the Spring 2016 Stock Drop

Plaintiff alleges that certain "deficiencies, particularly with the seams of the MicroCool gowns," rendered wearers vulnerable to exposure to infectious diseases, and that the gowns' "inability . . . to consistently provide the claimed AAMI Level 4 protection was well known to Defendants during the relevant period, but was concealed from investors."  (Id. ¶ 4.)  Plaintiff further alleges that the Defendants "aggressively marketed MicroCool as providing AAMI Level 4 protection" during the spread of the Ebola epidemic, and that "[i]nvestors were misled by Defendants' failure to disclose that: (i) the [] Micro-Cool surgical gowns consistently failed effectiveness tests and failed to meet industry standards[,] and (ii) Kimberly-Clark and Halyard had knowingly provided defective MicroCool surgical gowns to healthcare providers."  (Id. ¶¶ 5-6.)

The television news program 60 Minutes featured a segment on May 1, 2016, "report[ing] that Kimberly-Clark and Halyard had knowingly provided defective surgical gowns to U.S. workers at the height of the Ebola crisis," and the former Global Strategic Marketing Director for MicroCool, among other products, "admitted" to the television news program that the "gowns were prone to leaks and failed to meet the industry safety standards for the treatment

of Ebola." (Id. ¶ 7.)  The television program "also described an independent test in December 2012, requested by Cardinal Health, Inc., a competitor of Kimberly-Clark and later of Halyard, in which 77% of the MicroCool gowns tested failed," and tests and laboratory reports conducted in February and March 2013, requested by Kimberly-Clark, "in which some 21% of the MicroCool gowns tested failed." (Id. ¶ 80.)  Following this broadcast, Halyard stock fell 14.4%, from $31.50 on April 28, 2016, to $26.95 on May 2, 2016, a drop that Plaintiff attributes to the *60 Minutes* segment, and Plaintiff and members of the putative class allegedly suffered losses and damages due to the decline in the market value of Halyard's securities. (Id. ¶¶ 8-9.)

## DISCUSSION

When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 8(a) and 12(b)(6), the Court accepts as true the non-conclusory factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662 (2009); Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007).  However, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  Iqbal, 556 U.S. at 678 (internal quotation marks and citations omitted).

Plaintiff asserts that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, which make it unlawful to, inter alia, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  Claims

alleging fraud-based violations of the federal securities laws are subject to additional pleading requirements. Plaintiff's Section 10(b) claims are subject to the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). In re Scholastic Corp., 252 F.3d 63, 69-70 (2d Cir. 2001). Rule 9(b) requires that fraud allegations be stated with particularity. Fed R. Civ. P. 9(b). To satisfy the particularity requirement of Rule 9(b), the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted). Similarly, under the PSLRA, when a plaintiff seeks money damages that require proof of scienter, "the complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C.S. § 78u-4(b)(2) (LexisNexis 2008).

Count I: Section 10(b) and Rule 10b-5 Allegations

In Count I, Plaintiff asserts that the Defendants are liable for violating Section 10(b), and Rule 10b-5 promulgated thereunder, by making various untrue statements of material facts, omitting to state material facts and that, in so doing, they acted knowingly or with reckless disregard for the truth. (See CACAC ¶¶ 97-108.) Both the Halyard Defendants and Kimberly-Clark Defendants argue that Count I should be dismissed for failure to state a claim upon which relief may be granted because Plaintiff has failed to plead an actionable misstatement or omission, a strong inference of scienter, and an adequate allegation of loss causation. (See

Halyard Defs. Opening Br., Docket Entry No. 57, at 5-21; Kimberly-Clark Defs. Opening Br., Docket Entry No. 59, at 11-23.)

*Section 10(b) and Rule 10b-5 Pleading Requirements*

"To maintain a private damages action under § 10(b) and Rule 10b-5, 'a plaintiff must prove'" each of the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" <u>Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC</u>, 750 F.3d 227, 232 (2d Cir. 2014) (quoting <u>Stoneridge Inv. Partners, LLC v. Scientific—Atlanta, Inc.</u>, 552 U.S. 148, 157 (2008)). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts indicating that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." <u>Lawrence v. Cohn</u>, 325 F.3d 141, 147 (2d Cir. 2003) (quotation marks and citations omitted).

*Plaintiff Fails to Plead Adequately that Each of the Defendants Acted with Scienter*

As the Court finds that Plaintiff has failed to pled adequately that each of the Defendants acted with scienter, a necessary element to maintain a private damages action under § 10(b) and Rule 10b-5, and a court can dismiss a complaint "based on Plaintiff's failure to plead scienter alone," the Court will begin—and end—its Count I analysis with an examination of Plaintiff's scienter allegations. <u>See</u> <u>Shemian v. Research In Motion Ltd.</u>, No. 11-CV-4068-RJS, 2013 WL 1285779, at *24 (S.D.N.Y. Mar. 29, 2013), <u>aff'd</u>, 570 F. App'x 32 (2d Cir. 2014).

A securities complaint will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). A court conducting a scienter inquiry, "however, must assess the complaint in its entirety, and not scrutinize each allegation." Employees' Ret. Sys. v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (citing Tallabs, Inc., 551 U.S. at 326). Scienter may "be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (citations omitted).

The "'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit," and motives more "common" to corporate officers, "such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id.

If there is no showing of improper motive, a plaintiff may establish scienter by "strong circumstantial evidence of conscious misbehavior or recklessness" by, inter alia, "sufficiently alleg[ing] that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Id. at 199 (quotation marks and citation omitted). To sufficiently "plead recklessness through circumstantial evidence, [a plaintiff] would have to show, at the least, conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 202-03 (quotation marks and citation omitted). "'An allegation that a defendant merely ought to have known'" about reports or statements containing contrary facts "'is not sufficient to allege recklessness.'" See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (quoting Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012)).

"Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks and citation omitted). Plaintiff's scienter allegations are focused entirely on the alleged knowledge of the Individual Defendants.

In the CACAC, in a section titled "Additional Scienter Allegations," Plaintiff alleges that: Falk and Buthman received proceeds from "abnormal" sales of Kimberly-Clark stock during the Class Period; the Individual Defendants were "core executives" who received the Intertek Report in January 2013[3]; issues with MicroCool's sleeves "were well known throughout" Kimberly-Clark and Halyard, and "often discussed in meetings with senior

---

[3]     Plaintiff cites a pleading filed in 2016 in a separate lawsuit for the proposition that "Defendants" have admitted that they received the Intertek Report in January 2013. The quoted pleading, however, states only that **Kimberly-Clark** received the Intertek Report. (CACAC ¶¶ 36-37.)

executives, which included the Individual Defendants"[4]; that "senior management" "summarily ignored" issues regarding the inability to "validate" MicroCool's manufacturing process and the gowns' provision of AAMI Level 4 protection; and, finally, that the Defendants "doubled down on their [allegedly] misleading statements and pursued an aggressive marketing campaign focused on MicroCool's AAMI Level 4 designation" to "take advantage of the Ebola" pandemic scare. (CACAC ¶¶ 85-86.)

The Halyard Defendants assert that the CACAC fails to meet either prong of the scienter analysis, as it (1) insufficiently pleads that the Halyard Defendants had the "motive and opportunity to commit fraud," (2) lacks any indication that the Halyard Defendants "benefitted in some concrete and personal way from the purported fraud," and (3) because the existence of the Intertek Report and CW1 and CW2's testimony do not give rise to a "strong inference of scienter." (Halyard Defs. Opening Br., Docket Entry No. 57, at 12-18.) The Kimberly-Clark Defendants also assert that the CACAC fails to meet either prong of the scienter analysis, because (1) allegations of Messrs. Falk and Buthman's stock sales of Kimberly-Clark stock are irrelevant and not pled with the requisite particularity, and (2) Plaintiff fails to specifically plead direct or strong circumstantial evidence of scienter based on test results or CW1 and CW2's testimony. (Kimberly-Clark Defs. Opening Br., Docket Entry No. 59, at 16-22.)

Assessing the CACAC in its entirety, the Court concludes that Plaintiff has failed to establish a "cogent inference of scienter" "at least as compelling as any opposing inference one could draw from the facts alleged." See Tellabs, Inc., 551 U.S. 308, 324, 326.

---

[4]     The CW allegations relating to sleeve discussions refer only to "senior leadership," "senior management," and persons with titles other than those of the Individual Defendants. (See CACAC ¶¶ 40, 43-46.)

To begin with, Plaintiff has not alleged facts showing that the Defendants had "the motive and opportunity to commit fraud." See ECA, 553 F.3d at 198. Plaintiff makes a sole reference in the CACAC to alleged misrepresentations made by "corporate insiders" in order to "sell their own shares at a profit," arguing that certain sales of Kimberly-Clark stock by Messrs. Falk and Buthman before the Halyard spinoff "were abnormal as compared to previous sales of Kimberly-Clark stock by" them, and evidence a motive to commit fraud. (CACAC ¶ 85; Pl.'s Mem. of Law in Opposition to Defs.' Mots. To Dismiss the CACAC ("Pl. Br."), Docket Entry No. 64, at 34-35.) These allegations, which concern sales of Kimberly-Clark (not Halyard) stock, fail to specify when the alleged sales were made and whether they were proximate in time to any alleged acquisition of information or "misrepresentations" by Messrs. Falk and Buthman, and are conclusory and fail to meet the heightened Rule 9(b) and PSLRA particularity standards as to indicators of fraud or scienter. Nor does Plaintiff plead any facts to support an inference that such sales were "abnormal" beyond his conclusory characterization of the alleged sales. The allegations thus do not meet the "motive" standard, which "is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." See ECA, 553 F.3d at 198.

Nor do Plaintiff's conclusory allegations that the Defendants "doubled down on their [allegedly] misleading statements and pursued an aggressive marketing campaign focused on MicroCool's AAMI Level 4 designation" to "take advantage of the Ebola" pandemic scare (CACAC ¶¶ 5-6, 86) constitute anything more than an allegation that the Defendants had a motive "common to corporate officers . . . the desire for the corporation[s] to appear profitable and the desire to keep stock prices high" in light of global events beyond the Defendants' control. See ECA, 553 F.3d at 198. Such allegations "do not constitute 'motive' for purposes of

this inquiry."  See ECA, 553 F.3d at 198.  Finally, Plaintiff does not allege that the Halyard

Individual Defendants, Messrs. Abernathy and Voskuil, engaged in **any** stock sales—"abnormal"

or not—that evidence "motive and opportunity to commit fraud."  Plaintiff has accordingly failed

to allege plausibly that any of the Defendants had the "motive and opportunity to commit fraud."

 The Court next turns to an examination of whether Plaintiff has adequately

pleaded the required "strong inference" of scienter by alleging "strong circumstantial evidence of

conscious misbehavior or recklessness."  See id. at 199.  Plaintiff argues that "each of the

Defendants knew, or at minimum were reckless in not knowing, that the MicroCool surgical

gowns consistently failed effectiveness tests, failed to meet industry standards, and were

manufactured using a process that could not be validated to ensure consistent efficacy according

to AAMI Level 4 criteria," and, thus, the Defendants "knew facts or had access to information

suggesting that their public statements were not accurate." (Pl. Br. at 29.)  Though Plaintiff refers

to "Defendants" in his arguments regarding recklessness in his brief, it appears that he seeks to

establish scienter by alleging circumstantial evidence of recklessness based on the actions and

defined functions of each of the named Individual Defendants, who were the CEO and CFO of

each respective company at all relevant times, and to impute that scienter to the respective

corporate Defendants to establish "corporate scienter."  (See Pl. Br. at 29-33, 35-36.)

 With respect to the Individual Defendants, Plaintiff, however, has failed to "show,

at the least, conduct which is highly unreasonable and which represents an extreme departure

from the standards of ordinary care to the extent that the danger was either known to [them] or so

obvious that the [D]efendant[s] must have been aware of it."  See ECA, 553 F.3d at 202-03.

Nowhere in the CACAC does Plaintiff specifically plead facts demonstrating or supporting

plausibly an inference that Abernathy, Voskuil, Falk, or Buthman was personally informed or

would reasonably have been informed about any alleged issues with the MicroCool gowns, their failure to meet industry standards, or the ability of the manufacturing process to be validated to ensure it complied with AAMI Level 4 criteria, nor that the Individual Defendants' behavior was an "extreme departure from the standards of ordinary care."

Plaintiff's conclusory allegation that the Individual Defendants, "core executives of the Company" received the Intertek Report in January 2013, which "prov[ed] that a large amount of the gowns failed testing for AAMI Level 4" (see CACAC ¶ 86), does not meet Rule 9(b) and the PSLRA's heightened pleading requirement for particularity. Plaintiff does not plead with the required specificity that any of the Individual Defendants, or any Kimberly-Clark or Halyard employees who regularly came in contact with or met with the Individual Defendants, personally received the Intertek Report or any other substantiated report of issues with the MicroCool gowns, and that such reports would give rise to an affirmative obligation by the Defendants to disclose alleged issues with the MicroCool gowns, so that a failure to do so would constitute "an extreme departure from the standards of ordinary care." See ECA, 553 F.3d at 202-03.[5] Nor does Plaintiff allege with particularity that the Individual Defendants knew about the "danger" of the MicroCool gowns, or that the danger was "so obvious that" they "must have been aware of it." See id. at 202-03. There is no allegation of a reporting or other duty, or a statement made that was specifically contradictory of the alleged test results, that would support an inference of an obligation on the part of any of the Individual Defendants to know of and act

---

[5]     The general characterization of their positions as "core" is insufficient to plead plausibly that they personally received, reviewed or knew of the report at relevant times; the "admission" cited in the CACAC acknowledges only that Kimberly-Clark received the Intertek Report in 2013.

on the information in the testing reports.  The CACAC thus fails to plead facts indicative of an "extreme departure from the standards of ordinary care."  See id. at 202-03.

Nor do the allegations attributed to CW1 and CW2 give sufficient factual content to Plaintiff's argument for strong circumstantial evidence of scienter.  "[C]onfidential sources cannot be used to . . . merely parrot conclusory allegations contained in the complaint," and, "as with all allegations going to scienter, confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."  Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 590–91 (S.D.N.Y. 2011) (ellipses, brackets, quotation marks and citations omitted).  CW1 and CW2's statements as set forth in the CACAC merely attest to alleged knowledge of "senior management" or "senior executives" other than the Individual Defendants, adding nothing to provide support for Plaintiff's conclusory allegation that the "core executives" who had knowledge of the problems included the Individual Defendants.  (See id.; see also CACAC ¶ 86.)  Plaintiff does not allege that either CW1 or CW2 themselves attended meetings with any of the Individual Defendants where the alleged issues were discussed.  Vague allegations that CW1 attended meetings with unspecified "senior leadership of the company where the issue was discussed 'quite a bit'" and that CW2 attests that certain test results were shared with Halyard's quality department, and "were discussed in meetings" with unspecified "senior management that CW2 attended" (see id. ¶¶ 40, 46) are insufficient to establish strong circumstantial evidence of scienter.  See Glaser, 772 F. Supp. 2d at 594 (finding that statements by confidential witnesses who were not alleged to have ever had any contact with the individual defendants in that action were insufficient to support scienter).  Nor does the CACAC include

any specific allegations as to the information actually discussed at the alleged meetings. Plaintiff's allegations attributed to confidential witness testimony do not demonstrate that the Individual Defendants "actually possessed" adverse information regarding alleged issues with the MicroCool gown, and Plaintiffs' vague references to "senior leadership" and "senior management" do not suffice to tie the Individual Defendants to any information that was conveyed. See Glaser, 772 F. Supp. 2d at 590–91.

Nor does Plaintiff's conclusory scienter allegation that the "Defendants knew, or should have known, that MicroCool gowns did not provide the AAMI Level 4 protection promised," because of receipt of the Intertek Report and the CW testimony (CACAC ¶ 34) meet the pleading standard, because "an allegation that a defendant merely ought to have known" about reports or statements containing contrary facts "is not sufficient to allege recklessness." Lululemon, 14 F. Supp. 3d at 574. In Lululemon, the lead plaintiff brought a putative securities fraud class action against an athletic apparel maker and its corporate officers, arising from the company's recall of yoga pants due to sheerness and color fastness issues, and the court granted defendants' motions to dismiss for a variety of reasons, including the plaintiff's failure to sufficiently allege scienter. See id. at 553, 576-77. The Lululemon court declined to infer from allegations that the Lululemon CEO "received reports about quality problems and had access to information about those problems that she did not, or could not, believe in what she said publicly about the company's products at the time she was saying it," or to infer from the allegations that the founder and director "'would dip in and out of daily affairs'" and that "'his fingerprints [were] all over the company's policies and principles'" that he had knowledge that certain statements in a public filing regarding "the company's quality and quality controls were false and misleading." See id. at 585. The Lululemon court found that those allegations did not

specifically identify the "reports or statements containing" contrary facts to which Defendants had access and did not support "a strong inference of scienter."  See id.

Plaintiff here advances similar arguments: that it is "reasonable to presume that" the Individual Defendants "would have been aware of the deplorable test results and validation issues that called the efficacy of a key product into troubling question," and that as "high-level corporate officers who sign SEC filings," the Individual Defendants "had a duty to familiarize themselves with the facts relevant to the core operations of the company," and that they "may not ignore reasonably available data that would indicate that the statements they issued were materially false or misleading."  (See Pl. Br., at 31-32.)  Nowhere in the CACAC, however, has Plaintiff alleged that the Individual Defendants had access to specifically identified reports or statements containing facts contrary to the information set forth in the public filings which contained signed certifications by the Individual Defendants:  that Halyard "offer[s] surgical and infection prevention products for the operating room" and "is a global leader in education to prevent healthcare-associated infections," that the MicroCool gown is one of Halyard's "more important marks," and that the gown is "innovative, cost-effective and [a] high quality product," and a "principal source of revenue" for Halyard.  (See id. ¶¶ 59, 61, 67, 74.)  Plaintiff has not pleaded facts sufficient to support a "cogent inference of scienter" on the part of the Individual Defendants that is "at least as compelling as any opposing inference one could draw from the facts alleged."  See Lululemon, 14 F. Supp. 3d at 585; see also Tellabs, Inc., 551 U.S. at 324, 326.

Finally, for substantially the reasons set forth above with respect to the Individual Defendants, Plaintiff has failed to plead corporate scienter, as he has not pled "facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the

corporation acted with the requisite scienter, or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd., 797 F.3d at 177.

Given that Plaintiffs' scienter allegations are inadequate, the CACAC fails to meet the Rule 9(b) and PSLRA pleading standards and fails to state a claim upon which relief may be granted. Therefore, it is unnecessary to examine the remaining elements of their Section 10(b) and Rule 10b-5 claim. Count I is, accordingly, dismissed.

Count II: Section 20(a) Liability

In Count II, Plaintiff asserts that the Individual Defendants are liable under Section 20(a). A plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation" in order to establish a claim for control person liability under Section 20(a) of the Exchange Act. Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks omitted).

As explained above, Plaintiff has not stated a claim under Section 10(b) and Rule 10b-5 with respect to the Defendants. In the absence of plausible pleading of a primary violation, Plaintiff cannot state a claim under Section 20(a). Count II is, accordingly, dismissed.

Plaintiffs' Motion to Strike Docket Entry Nos. 56-2 and 56-3

The Halyard Defendants attached two press releases as exhibits (the "Challenged Exhibits") to a declaration in support of their motion to dismiss Plaintiff's claims. (See Jordak Decl., Exs. B, C, Docket Entry Nos. 56-2, 56-3.) Plaintiff now moves to strike the Challenged

Exhibits, and any references to those exhibits contained in the Halyard Defendants' brief, to the extent they are offered for the truth of the matter asserted.

Because the Court's foregoing analysis does not rely on those documents, it obviates the need to consider them. Plaintiffs' motion to strike is therefore denied as moot.

CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the Corrected Amended Class Action Complaint are granted in their entirety, and Plaintiff's motion to strike certain documents is denied as moot in light of the disposition of the Defendants' motions to dismiss.

The Clerk of Court is requested to enter judgment in Defendants' favor and close this case.

This Memorandum Opinion and Order resolves Docket Entry Nos. 55, 58, and 67.

        SO ORDERED.

Dated: New York, New York
       March 30, 2018

                                     __/s/ Laura Taylor Swain__
                                     LAURA TAYLOR SWAIN
                                     United States District Judge